1

2

3

4

5

6                              UNITED STATES DISTRICT COURT
                              WESTERN DISTRICT OF WASHINGTON
7                                          AT SEATTLE

8    RODNEY WHEELER,

9                            Plaintiff,              CASE NO. C19-1410-JCC-MAT

10         v.

11   ELEANOR BROGGI, et al.,                         REPORT AND RECOMMENDATION

12                           Defendants.

13

14                                     INTRODUCTION

15         In August 2016, Justin Love was shot and killed outside a Motel 6 in SeaTac, Washington

16   and a stray bullet hit and wounded another motel guest.  Plaintiff Rodney Wheeler was charged

17   with second degree murder, assault, and unlawful possession of a firearm.  In March 2019, a King

18   County Superior Court jury acquitted plaintiff of all crimes charged.

19         This action, alleging violations of state law and plaintiff's civil rights under 42 U.S.C. §

20   1983, followed plaintiff's acquittal.  Plaintiff alleges King County Detectives Eleanor Broggi and

21   Matthew Olmstead violated his Fourth and Fourteenth Amendment rights through unreasonable

22   search and seizure and his arrest and more than two years of pre-trial detention without probable

23   cause or due process.  (Dkt. 8.)  Specifically, he maintains Broggi and Olmstead, in affidavits for

REPORT AND RECOMMENDATION
PAGE - 1

1    search and arrest warrants and in the certificate of probable cause, made false statements and

2    omitted important facts that would have undermined the allegations against him, and that Broggi

3    ignored evidence not aligning with her theory of the case and withheld exculpatory evidence.  He

4    alleges defendant King County condoned and ratified the conduct of its officers and agents and is

5    also liable under state law for the tort of malicious prosecution committed by its agents while

6    acting within the scope of their employment.

7        By Order dated May 4, 2020, this Court denied defendants' Rule 12(b)(6) Motion to

8    Dismiss.  (Dkt. 27.)  Defendants filed an answer to the amended complaint, including affirmative

9    defenses and a counterclaim by defendants Broggi and Olmstead for malicious prosecution against

10   a law enforcement officer in violation of RCW 4.24.350.  (Dkt. 38.)

11       Plaintiff's Motion for Partial Summary Judgment Dismissing the Counterclaim (Dkt. 38)

12   and defendants' Motion for Summary Judgment (Dkt. 41) are now pending before the Court.  Both

13   motions are opposed (Dkts. 44 & 51; *see also* Dkts. 52-53) and the parties request oral argument.

14   The Court, having considered the motions, responses, all documents submitted in support and

15   opposition, and the remainder of the record, finds oral argument unnecessary, and concludes

16   defendants' motion (Dkt. 41) should be DENIED, plaintiff's motion (Dkt. 38) should be

17   GRANTED, and defendants' counterclaim should be DISMISSED.

18                                            BACKGROUND

19       As described in relation to defendants' motion to dismiss:

20           The shooting death of Justin Love outside a SeaTac Motel 6
         occurred at approximately 9:55 p.m. on August 31, 2016.  Love and
21       his friends/co-workers Michael Meyer and William Newell had
         been staying at the motel while working in the area.  Just prior to the
22       shooting, Love, Meyer, and Newell had been arguing with the
         shooter while standing on opposite sides of a fence dividing the
23       motel parking lot from a street.  Love was shot while climbing the
         fence.  "The area behind the fence was well-known for drug use and

REPORT AND RECOMMENDATION
PAGE - 2

sales and it was not uncommon for persons to loiter in the area and meet occupants of the Motel 6."  (Dkt. 8, ¶4.17.)

As set forth in the Amended Complaint (*see* Dkt. 8), Meyer, Newell, and Brian Falgout, an uninvolved witness, described the shooter as a black male, appearing to be in his early twenties, shorter and with a slight/slender build, wearing dark or all-black clothing, and leaving the scene in a black or dark-colored car.  Meyer depicted the shooter as having dreadlocks or twisted/shaggy/dreaded hair, Falgout described him as wearing "'all black and a black hoodie'", while Newell, alone among the witnesses, stated the shooter was wearing a brown backpack.  (*Id*., ¶¶4.6-4.7, 4.11, 4.14.)  Falgout provided his description in a 911 call at 10:33 p.m. that night, stating he had seen "the whole thing" and thought he saw the suspect "watchin'" in an apartment complex across the street.  (*Id*., ¶ 4.11.)  He provided a written statement at 11:30 p.m. and a later interview on September 16, 2016.  (*Id*., ¶¶4.12-.13.)

Detective Broggi obtained surveillance video footage from the motel and sent still photos taken from the footage and depicting black men to Newell, including three photos of Wheeler with a date and timestamp showing him in the motel shortly before the shooting.  Wheeler was the only individual in the photos with a backpack.  The photos also show Wheeler, who is "39 years old, six feet tall, [] 200 pounds", and does not have dreadlocks, wearing "blue jeans, a gray hoodie with bright white strings and a zipper, and a black hat with a large, bright white Carolina Panthers logo."  (*Id*., ¶4.15.)  As memorialized in a September 7, 2016 email Broggi sent to a prosecutor, Newell thought the shooter was "'the one with the backpack,' but that he would have to see a better photo to be sure."  (*Id*., ¶¶ 4.23, 4.69.)  Broggi did not show the surveillance photos to any other witness.

In another email, dated September 9, 2016, Broggi wrote that Wheeler was "'our shooter but no pc yet,'" and acknowledged she "still needed 'to do a montage.'"  (*Id*., ¶4.26.)  On September 15, 2016, Broggi sent a copy of Wheeler's photo to the prosecutor with the message:  "'This is going to be our shooter.'"  (*Id*., ¶4.28.)  That same day, Broggi conducted the photo montage, separately, with Newell and Meyer.  Neither Newell, nor Meyer selected Wheeler from the lineup.  Newell said none of the individuals was the shooter, while Meyer identified two other members of the lineup as possible suspects.

On September 16, 2016, Olmstead obtained three warrants for plaintiff's cell phone records.  (Dkt. 14, Exs. 11-12.)  The

REPORT AND RECOMMENDATION
PAGE - 3

warrant affidavit reflects Newell's report of hearing something hit his motel room window screen prior to the argument and observing a black male outside the window. Newell had seen the same black male roughly twenty times in the preceding weeks, routinely wearing a distinct brown leather backpack and entering the motel parking lot by hopping over a chain link fence. The affidavit states surveillance footage matched the description provided by Newell, that still photographs from the footage were shown to both Meyer and Newell, and that "[b]oth agreed that the still photographs appeared to be the exact same person who shot Love." (*Id.*, Ex. 11 at 3.) It does not mention Falgout, any descriptions of the shooter other than his race, or any descriptions of a vehicle. Nor does it mention the photo montage or that surveillance footage showed Wheeler at the motel on only two prior occasions in the two weeks before the shooting. (Dkt. 8, ¶¶ 4.35.)

The warrant affidavit also describes interviews Detectives Broggi and Olmstead conducted with Daniela Cuadra and Abeline Kidane, both of whom stayed at the motel during the relevant period. Cuadra identified Wheeler from photographs and provided the three phone numbers subject to the search warrants. The affidavit states the detectives located a booking photograph of plaintiff and confirmed he was the same person in the video. Cuadra stated Wheeler was her heroin dealer and that he climbed a fence to get to the motel, usually wore an expensive brown leather backpack, and always made phone contact before his arrival. Cuadra stated Wheeler was in her room until about a half-hour prior to the shooting and, about twenty minutes after the police arrived, called her repeatedly to inquire about her welfare and the police activity. Kidane described Wheeler's presence in the motel prior to the shooting and a later call to Cuadra. The affidavit does not mention that an examination of Cuadra's phone did not reveal the calls she described receiving from Wheeler shortly after the shooting. (*See id.*, ¶ 4.41.)

On October 5, 2016, Olmstead obtained a warrant to search Wheeler's home and person and to seize evidence. The warrant affidavit contains and omits the same information provided in relation to the cell phone warrants and describes searches resulting from those warrants as revealing phone activity using cellular towers close to the motel just prior to the shooting. (Dkt. 14, Ex. 13.) It states the results of the warrant from one phone showed the number was not acquired and activated until the day after the shooting. The affidavit does not mention that Cuadra's phone did not show calls allegedly received from Wheeler after the shooting or that Wheeler's cell phone records did not show any such calls.

(*See* Dkt. 8, ¶ 4.55.)  Nor does it describe calls Wheeler did place and receive around the time of the shooting, cell tower data placing him in Renton at the time Falgout reported seeing the suspect in an apartment complex across the street from the motel, or that the records showed Wheeler travelled out of State during the time Newell reported frequently seeing him at the motel.  (*See id.*, ¶¶ 4.46, 4.56.)  The affidavit states that, at the scene of the homicide, Newell "and others" described a brown leather backpack.  (Dkt. 14, Ex. 13 at 5.)  It notes Cuadra's report plaintiff drove a silver Honda Pilot and that police later identified Wheeler's car as a "new white Ford Fusion" and his girlfriend's car as a silver Honda Pilot.  (*Id.*)

The State of Washington, also on October 5, 2016, charged Wheeler as described above.  The Certification for Determination of Probable Cause signed by Broggi includes descriptions of the suspect from Meyers  ("shorter, but slender with dreadlocks") and Newell ("about 6-0 with a skinny build . . . wearing dark clothing, baseball cap, and a brown suede backpack" and driving away in a "dark colored older sports car"), the events on the night of the shooting, including a rock thrown at a window prior to the argument, and information obtained from Cuadra and Kidane.  (*Id.*, Ex. 1.)  Falgout is not mentioned.  The certification states that Newell, based on still photos from surveillance footage, identified "a male with a tan backpack, grey sweat suit and [a] baseball hat" and was "90% certain" this man was the shooter.  (*Id.* at 3.)  It states the man identified appears on the Motel 6 footage on several dates, including the date of the shooting, and was wearing a tan backpack on each occasion.  The affidavit also states neither Newell, nor Meyers identified Wheeler when shown a photographic lineup.  It notes one cell phone search warrant indicated the use of the phone "before the time of homicide in the area of [the] incident[.]"  (*Id.* at 4.)

(Dkt. 22 at 2-6.)

The parties submit additional evidence in support of and in opposition to the dispositive motions.  Plaintiff provides, *inter alia*, portions of the King County Sheriff's Office criminal investigation file, copies of emails, surveillance video footage and photographic stills, photographic montages, phone records and a cell phone mapping report, deposition excerpts, and witness interview and other transcripts.  (Dkt. 39 (First Decl. of Tiffany Cartwright), Exs. 1-40; Dkt. 50 (Second Decl. of Tiffany Cartwright), Exs. 1-10).)  Defendants provide some of the same

REPORT AND RECOMMENDATION
PAGE - 5

and similar materials, as well as the certified Verbatim Report of Proceedings ("RP") for the criminal proceedings before Judge John Erlick occurring between January 9 and March 1, 2019. (Dkt. 42 (Decl. of Ann Summers), Exs. 1-6; Dkt. 45 (Second Decl. of Ann Summers), Exs. 1-13).)

The newly provided materials add to the factual background underlying the parties' motions. The video surveillance footage, which is neither of high quality, nor continuous, shows plaintiff walking inside the motel and, briefly, walking in the motel parking lot towards the fence. (Dkt. 39, Ex. 40.) As plaintiff confirmed in his testimony at trial, the video also captures, distantly, his movements climbing over the fence. (Dkt. 45, Ex. 9 at 180:3-184:10.) The video shows Newell and Love subsequently exit the motel and walk towards the fence, where they were later joined by Meyer and where the shooting occurred, but does not show the shooter. (Dkt. 39, Ex. 40.)

Defendants point to a police record containing information obtained from an additional witness, Jessica Hale, and reflecting her report she saw "a black male, late twenties, wearing a gray hoodie (pulled over his head), black pants, black backpack, standing on the other side of the [motel] fence." (Dkt. 42, Ex. 1 at 6.)[1] Hart had seen this individual before, always parking on the other side of the fence, and, after the shooting, saw him "walk slowly and calmly back to a black car and drive off slowly." (*Id.*) Defendants provide polygraph examination reports for Newell and Meyer reflecting no deception or probable no deception indicated. (Dkt. 45, Ex. 6.) They also point to evidence at trial as showing plaintiff was still in the proximity of the motel just after the shooting, while plaintiff contends the evidence is consistent with him having left the motel before the shooting occurred. (*See, e.g.*, Dkt. 39, Ex. 39 at 77-78, 95-96 and Ex. 28 at 14.) Plaintiff also

---

[1] The trial transcript shows Hale later testified the description in the record was not correct and that the man on the other side of the fence was black, about 160-200 pounds and five feet six inches tall, and wearing: "All black. Black hoodie. He had a black hoodie and like black sweats or blue jeans or really dark jeans." (Dkt. 43, Ex. 3, RP 2/7/19 at 24:4-11, 67:1-69:10, 76:11-13, 76:22-77:5.)

REPORT AND RECOMMENDATION
PAGE - 6

points to, among other things, Newell's polygraph examination transcript in which he disclosed his criminal history, including providing false information to the police, and a September 1, 2016 email to prosecutor Julie Kline stating Broggi "seems confidant [they] weren't getting the whole story from Love's buddies [Newell and Meyer]."  (Dkt. 50, Exs. 1 & 2.)

Other documents show that, in a July 30, 2018 pretrial hearing, Detective Broggi testified regarding the photographic stills taken from the surveillance video and sent to Newell on September 6 and 7, 2016.  (Dkt. 39, Ex. 27.)  Broggi agreed the photos were of poor quality and did not result in a clear identification, leading to the decision to conduct a photo montage.  (*Id*. at 47-48, 68-69.)  She testified nothing of evidentiary value was found in the search of plaintiff's home or cars and that plaintiff was never associated with a small black car.  (*Id*. at 66-67, 69.)

In a January 9, 2019 pretrial hearing, the state court ordered Broggi to memorialize her September 7, 2016 conversation with Newell and to provide any communications with him regarding identification of a suspect, including anything supporting the statement Newell was "90% certain" the shooter was "a male with a tan backpack, grey sweat suit and [a] baseball hat[.]" (Dkt. 43, Ex. 3, RP 1/9/19 at 88:13-90:6, 104:19-105:13; Dkt. 50, Ex. 3 at 4 and Ex. 29.)  Broggi submitted a supplemental report stating Newell told her the shooter did not appear in any of the still photographs from the surveillance footage she sent him in September 2016.  (Dkt. 50, Ex. 8 at 3; *see also id*., Ex. 3 at 3.)  The defense moved to dismiss and Broggi submitted an additional supplemental report stating her prior supplemental report was inaccurate.  (Dkt. 39, Ex. 25.)  This new supplemental report stated Newell "did not pick any of the[] still photographs 100%", but did say of the second set of photographs "he was 90% sure that this subject was the suspect who shot Love and went on to describe in detail the clothing and the backpack the suspect had been wearing", and "identified a male with a tan backpack, grey sweat suit and baseball hat as the man

REPORT AND RECOMMENDATION
PAGE - 7

who shot Love." (*Id*. at 1-2.)

Only later, after the trial began, did the prosecution produce the September 7, 2016 email in which Broggi informed Kline:  "I just talked to [Newell]. Of the pictures I sent he is 95% sure it's the one with the backpack. If we get a better picture of him he can be sure. The backpack stood out to him cause it looked like a Ninja Turtle and didn't match what he was wearing." (Dkt. 39, Ex. 8.)  Considering the defense's motion to dismiss, Judge Erlick noted the absence of "any evidence of contemporaneous identification of any clothing" in the email and found it contradictory to the certificate of probable cause as to Newell's description of the suspect's clothing. (*Id.*, Ex. 31 at 9-12; Dkt. 50, Ex. 3.)  He found the certificate "at best . . . ambiguous, and at worst . . . misleading and inaccurate" and "tended to believe it was the latter because of the [second] supplemental report." (Dkt. 39, Ex. 31 at 9.)  He identified a lack of clarity as to the statement the backpack "didn't match what he was wearing", which could have indicated plaintiff's clothing did not match what Newell remembered the shooter to be wearing and which would be "extraordinarily exculpatory." (*Id*. at 9-10.)  He found "gross mismanagement on the part of the State" in the failure to turn over the email and that plaintiff suffered "severe and significant prejudice" to his right to a speedy trial and for his counsel to have the opportunity to meaningfully prepare for trial with all pertinent information. (Dkt. 50, Ex. 3 at 6.) While declining to dismiss the prosecution, Judge Erlick excluded any testimony regarding Newell's September 7, 2016 statements to Broggi regarding the photographs of plaintiff. (*Id*.)

After the prosecution closed its case, the defense again moved to dismiss through a "halftime" motion challenging the sufficiency of the evidence. (Dkt. 43, Ex. 3, RP 2/25/19 at 163:22-166:17.) Judge Erlick stated the defense made a compelling case with respect to the weight of the evidence, which was highly circumstantial and lacked "any credible positive identification"

through eyewitness testimony, and agreed plaintiff's uncontested presence at or immediately prior to the shooting was not sufficient to support a guilty verdict.  (*Id*. at 172:12-23.)  However, he found additional evidence to support the case through a witness named Jeanette Ault, whose testimony corroborated Newell's testimony an argument occurred beginning on the "motel or east side of the fence with an individual who the jury could infer was Mr. Wheeler."  (*Id*. at 172:21-173:18.)  He added that all but one witness testified to hearing an argument between an African-American individual on the west side of the fence and Newell and Meyer climbing over or on the east side of the fence; that Meyer alone initially thought someone else was present; that "Ms. Ault's observations were not necessarily continuous and that she likely lost observation of the individual she saw leaving the fence and seemingly heading towards his car and then coming back."; and that it was "conceivable that that was a different person, other than the person who originally crossed that fence, who is likely Mr. Wheeler."  (*Id*. at 173:19-174:9.)  Judge Erlick found sufficient circumstantial evidence to deny the halftime motion and a determination of whether or not there was reasonable doubt as to guilt properly left to the jury.  (*Id*. at 174:10-20.)  The jury subsequently found plaintiff not guilty.  (*See id.*, RP 3/1/19.)

## DISCUSSION

A.   <u>Summary Judgment Standard</u>

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).   The burden then shifts to the nonmoving party to establish a genuine issue of material fact.  *Matsushita Elec. Indus. Co.*

1    *v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).   The Court must draw all reasonable

2    inferences in favor of the nonmoving party.  *Id*.

3           The moving party can satisfy its burden on summary judgment by producing evidence that

4    negates or establishing the absence of evidence to support an essential element of the non-moving

5    party's claim.  *James River Ins. Co. v. Herbert Schenk, P.C.,* 523 F.3d 915, 923 (9th Cir. 2008).

6    The party opposing summary judgment must present significant and probative evidence to support

7    its claim or defense.  *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir.

8    1991).  The nonmoving party also "must do more than simply show that there is some metaphysical

9    doubt as to the material facts."  *Matsushita Elec. Indus. Co.*, 475 U.S. at 585.  "Only disputes over

10   facts that might affect the outcome of the suit under the governing law will properly preclude the

11   entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

12   B.    <u>Section 1983 Claim Standards</u>

13          In addition to the state law claim and counterclaim, plaintiff brings claims under 42 U.S.C.

14   § 1983.  With a § 1983 claim, plaintiff must show (1) he suffered a violation of rights protected by

15   the Constitution or created by federal statute, and (2) that the violation was proximately caused by

16   a person acting under color of state or federal law.  *West v. Atkins*, 487 U.S. 42, 48 (1988);

17   *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).

18          Under the doctrine of qualified immunity, government officials "performing discretionary

19   functions [are protected] from liability for civil damages insofar as their conduct does not violate

20   clearly established statutory or constitutional rights of which a reasonable person would have

21   known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In determining whether qualified

22   immunity applies, the Court considers whether the plaintiff alleged sufficient facts to make out a

23   violation of a constitutional right, and whether the constitutional right was clearly established at

REPORT AND RECOMMENDATION
PAGE - 10

the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *modified by Pearson v. Callahan*, 555 U.S. 223 (2009) (explaining "that, while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory"). "'A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). In considering qualified immunity at the summary judgment stage, the Court considers the facts alleged in the light most favorable to the party asserting injury. *Scott v. Harris*, 550 U.S. 372, 377-78 (2007); *Longoria v. Pinal Cty.*, 873 F.3d 699, 704 (9th Cir. 2017).

To establish municipal liability, plaintiff must show a "policy or custom" led to the injury. *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978). A municipality cannot be held liable under § 1983 solely because it employs a tortfeasor. *Id.* at 691-94. Liability must rest on the actions of the municipality, not on the actions of an employee. *Bd. of the Cnty. Comm'rs of Bryant Cnty. v. Brown*, 520 U.S. 397, 403 (1997). A claim may involve implementation of official polices or established customs inflicting the injury, omissions or failures to act amounting to a policy of deliberate indifference to constitutional rights, or ratification of a subordinate's unconstitutional conduct by an official with final policy-making authority. *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249-50 (9th Cir. 2010), *overruled in part on other grounds in Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016).

C.   Defendants' Motion for Summary Judgment

1.   Malicious prosecution:

To prove malicious prosecution, a plaintiff must show, *inter alia*, "that there was want of probable cause for the institution or continuation of the prosecution" the plaintiff claims to be

1   malicious.  *Hanson v. City of Snohomish*, 121 Wn.2d 552, 558, 852 P.2d 295 (1993).  Accordingly,

2   "probable cause is a complete defense to malicious prosecution."  *Id*.

3      As in their motion to dismiss, defendants argue plaintiff is barred by collateral estoppel

4   from establishing a want of probable cause given the trial court's ruling denying plaintiff's

5   halftime motion to dismiss.  The undersigned previously found defendants could not establish the

6   first collateral estoppel requirement – that the issue resolved in the halftime motion was identical

7   to the issue to be resolved in the claim for malicious prosecution, "namely, whether the evidence

8   supports a finding of probable cause[]" – where the trial judge's decision relied on materially

9   different evidence than the evidence known to the arresting officer.  (Dkt. 22 at 12-15 (relying on

10  *Wige v. City of L.A.*, 713 F.3d 1183, 1185-86 (9th Cir. 2013); also citing *Haupt v. Dillard*, 17 F.3d

11  285, 289 (9th Cir. 1994)).  Because Judge Erlick explicitly relied on the testimony of witness

12  Jeanette Ault in denying the motion to dismiss and because that evidence was obtained after and

13  not known to arresting officers, defendants did not establish the identical issues required to apply

14  collateral estoppel to the claim of malicious prosecution.  (*Id*. at 14.)

15     In overruling defendants' objections to the Report and Recommendation, Judge

16  Coughenour distinguished *Hanson*, 121 Wn.2d at 560-64, a case in which the Washington

17  Supreme Court found a prior conviction by a jury conclusively established probable cause and that

18  collateral estoppel barred a malicious prosecution claim brought after acquittal at a second trial.

19  Judge Coughenour found a jury's determination of guilt significantly different from a trial judge's

20  ruling on a halftime motion and noted that, unlike *Hanson*, the only jury to consider plaintiff's

21  case acquitted him of the charges.  (Dkt. 27 at 4-5.)  Also, while Washington courts have yet to

22  address whether a halftime ruling finding probable cause but preceding acquittal constitutes an

23  identity of issues for a malicious prosecution claim, other courts, applying the identical element

REPORT AND RECOMMENDATION
PAGE - 12

1   under California law, have found a probable cause ruling in a preliminary hearing does not satisfy

2   that element "'[i]f the evidence known to the arresting officers is materially different from the

3   evidence presented at the preliminary hearing.'"  (*Id.* (quoting *Wige*, 713 F.3d at 1185).)

4        Defendants now ask for reconsideration, asserting the Court's reliance on *Wige* runs

5   counter to *Hanson*.[2]  They request that the Court certify to the Washington Supreme Court the

6   question of whether a denial of a motion to dismiss at the close of the State's case in a criminal

7   trial precludes a subsequent malicious prosecution action against law enforcement officers.  They

8   maintain certification is appropriate because of the significant policy implications.  *See McKown*

9   *v. Simon Prop. Group, Inc.*, 689 F.3d 1086, 1091 (9th Cir. 2012).

10       Plaintiff objects to defendants' request for reconsideration as untimely, insufficient to meet

11  their burden on summary judgment, and otherwise lacking merit.  Plaintiff, for example,

12  distinguishes *Hanson* as not entailing consideration of facts known when charges were filed or

13  whether they differed from evidence at trial.  In that case, the court found no basis to relitigate the

14  "same arguments and the same evidence" previously addressed.  *Hanson*, 121 Wn.2d at 561.

15       The parties also again dispute whether the evidence at trial was materially different.

16  Plaintiff points to Judge Erlick's focus on Ault's testimony as the basis for his decision and argues

17  it was particularly crucial in light of Newell's credibility problems.  (*See* Dkt. 50, Ex. 1 (in the

18  polygraph examination, Newell admitted he was a felon with prior convictions for drugs, carrying

19  concealed weapons, and providing false information to police) and Ex. 2 (September 1, 2016 email

20  from Kline stating: "Broggi is lead.  She seems confidant we aren't getting the whole story from

21

22  ———————————
     [2] A federal court looks to state law in determining the preclusive effect of a state court judgment.
23  *Gupta v. Thai Airways Int'l, LTD*, 487 F.3d 759, 765 (9th Cir. 2007).  A detailed description of other
     applicable standards, the parties' arguments, and the undersigned's reasoning may be found in the prior
     Report and Recommendation.  (*See* Dkt. 22 at 10-15.)

REPORT AND RECOMMENDATION
PAGE - 13

[Newell and Meyer] at this point.")) Defendants maintain Ault's testimony did nothing more than corroborate Newell's account that the argument with the shooter began in the parking lot, after which the shooter climbed the fence, an account already significantly corroborated by other witnesses, the results of Newell's polygraph examination, and the surveillance video. Defendants note that probable cause is based on the totality of the circumstances and does not require any specific showing of the veracity of an eyewitness. *Illinois v. Gates*, 462 U.S. 213, 234 (1983).

Plaintiff also points to other new evidence before Judge Erlick. That is, while Newell told the police the shooter was wearing dark or all black clothing (Dkt. 39, Ex. 6 at 2-3 (shooter "had black pants on, black shirt, a black over-shirt, a brown backpack, a black hat")), he testified at trial the shooter wore "some type of blue or black blue jeans, black shirt, a black hat with a little gray hoodie[.]" (Dkt. 43, Ex. 3, RP 2/6/19 at 53). This new evidence from Newell was the only testimony that matched plaintiff's appearance on the surveillance video. Defendants deny the probable cause determination hinged on the colors of the shooter's clothing and observe that Newell consistently maintained the shooter was a black male wearing a brown leather backpack, who exited the motel, crossed the parking lot, and climbed the fence just before the shooting.

As discussed in the prior Report and Recommendation, Judge Erlick based his decision to deny the halftime motion on his belief there was additional evidence to support the case, specifically, that "the shooter got into an argument with the victim and Mr. Newell that essentially continued to the other side of the fence." (*Id.*, RP 2/25/19 at 172:21-173:3.) He stated:

> Now, the defense did a commendable job in impeaching Mr. Newell about that argument, and the circumstantial evidence also supports the defense theory that there was no such argument.
>
> *On the other hand, the evidence presented by the State through Ms. Ault corroborates Mr. Newell's testimony that there was such an argument.* And of course, at this stage it would be inappropriate for

the Court to do any weighing of credibility or such.

> *So if we look just at Ms. Ault's testimony*, we have her observation of this argument on the motel side or east side of the fence with an individual who the jury could infer was Mr. Wheeler.  Even though we don't see the argument, we do see Mr. Wheeler in that parking lot at approximately the time that there would be an argument.

(*Id.* at 173:4-18 (emphasis added).)

Defendants note that the Court now has the entire criminal transcript available in considering their reasserted arguments, but do not identify what in that transcript would support a different conclusion.  If anything, the complete record shows an additional material difference in the evidence before Judge Erlick through Newell's different description of the shooter's clothing.  The undersigned, as such, finds no basis for altering the prior conclusion on collateral estoppel.  Nor do defendants set forth any basis for altering the Court's prior rejection of their request for certification to the Washington Supreme Court.  *See* RCW § 2.60.020 (when finding it "necessary to ascertain the local law of this state in order to dispose of such proceeding and the local law has not been clearly determined," federal court may certify question of local law to the state supreme court).  Defendants' request for summary judgment on this claim should be denied.

      2.    <u>Exculpatory evidence</u>:

In alleging a denial of due process, plaintiff points to the September 7, 2016 email Broggi sent to Kline stating Newell thought the shooter was "'the one with the backpack,' but that he would have to see a better photo to be sure."  (Dkt. 8, ¶¶ 4.23, 4.68; *see also* Dkt. 39, Ex. 8 ("I just talked to [Newell]. Of the pictures I sent he is 95% sure it's the one with the backpack. If we get a better picture of him he can be sure. The backpack stood out to him cause it looked like a Ninja Turtle and didn't match what he was wearing."))  He alleges Broggi withheld the email from his defense for more than two years, until after the trial started, despite a court order to turn over all

REPORT AND RECOMMENDATION
PAGE - 15

such communications.  (Dkt. 8, ¶4.70.)  He alleges Broggi and Olmstead withheld numerous other pieces of material exculpatory evidence, including, but not limited to, emails between Broggi and Newell; text messages between Broggi and Cuadra; records related to Cuadra's phone and to payments made to her by Broggi and Olmstead; other evidence of favorable treatment given Cuadra and Kidane; and communications to Broggi and Olmstead regarding other potential suspects, disregarded because of their focus on plaintiff.  (*Id*., ¶4.78.)  He avers this material, exculpatory evidence was withheld intentionally and with deliberate indifference to and reckless disregard for his constitutional rights, and that the failure to disclose delayed his trial and extended the length of his unlawful pre-trial detention.

Defendants observe that, under *Brady v. Maryland*, 373 U.S. 83 (1963), both prosecutors and the police must disclose exculpatory evidence to criminal defendants, and that a plaintiff must show the evidence at issue was favorable because it was exculpatory or could be used to impeach, was suppressed, and resulted in prejudice.  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  They state there can be no *Brady* violation unless a failure to disclose exculpatory evidence "was so serious that there is a reasonable probability the suppressed evidence would have produced a different verdict."  *Id.* at 281.  As in the motion to dismiss, they maintain plaintiff's due process claim fails because it is undisputed the prosecutor received the September 7, 2016 email (Dkt. 42, Ex. 4), that the defense was also in possession of that email at trial (Dkt. 43, Ex. 3, RP 1/9/19 at 47-48), *see U.S. v. McKinney*, 758 F.2d 1036, 1049 (5th Cir. 1985) (no violation under *Brady* where evidence favorable and material to the defense is disclosed during the trial), and because plaintiff was acquitted (*see* Dkt. 41 at 17 (citing cases)).  They assert evidence relating to Cuadra's credibility was known to and used by plaintiff at the time of trial and would not be material because it is undisputed Cuadra accurately identified plaintiff in the surveillance footage and plaintiff

largely corroborated her testimony.

Under Ninth Circuit law, "an acquittal does not bar a Section 1983 action based on a due process violation during an underlying criminal proceeding." *Soo Park v. Thompson*, 851 F.3d 910, 923 (9th Cir. 2017). "'[A]cquittal does not erase all injury' but instead 'speaks only to the amount of damages.'" *Id*. (quoting *Haupt*, 17 F.3d at 287)). In *Soo Park*, the Ninth Circuit contrasted a § 1983 action from a criminal case in which a defendant seeks reversal of his conviction and "suppressed evidence or testimony is only material if it could have affected the fact-finder's determination whether the defendant is guilty beyond a reasonable doubt." *Id*. at 925 (citing *United States v. Valenzuela-Bernal*, 458 U.S. 858, 874 (1982)).

> [I]n a Section 1983 action, the plaintiff is not seeking reversal of his conviction, but rather compensation for the violation of his constitutional rights during a previous criminal trial. In other words, he is seeking to vindicate his right to a procedurally fair criminal trial. Consequently, the materiality test in a Section 1983 case is directed towards a different question: suppressed evidence or testimony is material only if it affected the question whether the defendant was deprived of a fair trial.

*Id*. at 926 ("The fact that a defendant was acquitted has little to do with whether the trial was fair, and therefore has little to do with materiality in the context of a Section 1983 claim.") (internal citation to *Haupt*, 17 F.3d at 287). Judge Coughenour rejected defendants' contention plaintiff's acquittal barred his claim and defendants do not provide any basis for further consideration of that issue. (*See* Dkt. 27 at 9 (overruling objection and denying request for a certificate permitting an appeal "on the question of whether an acquittal prohibits a § 1983 claim, given that the Ninth Circuit has already spoken on this issue."))

Nor do defendants otherwise establish their entitlement to summary judgment. The undersigned found defendants failed to support their motion to dismiss by addressing the due

REPORT AND RECOMMENDATION
PAGE - 17

process allegation only in relation to Broggi's September 7, 2016 email.  (Dkt. 22 at 21-22.)  Judge Coughenour subsequently found plaintiff stated a plausible claim in alleging the failure to timely disclose exculpatory evidence obstructed trial counsel's ability to present that testimony.  (Dkt. 27 at 9.)  Defendants now address both the email and evidence bearing on Cuadra's credibility, and reiterate their prior arguments under *Brady*.

In relation to the September 7, 2016 email, Judge Erlick found "gross mismanagement" by the State and that plaintiff suffered "severe and significant prejudice" to his right to a speedy trial and for his counsel to have the opportunity to meaningfully prepare for trial with all pertinent information.  (Dkt. 50, Ex. 3 at 6.)  In her deposition, Kline testified she would not have considered the email from Broggi to have triggered her obligation under *Brady* because she expected Broggi would have documented the circumstances of the identification elsewhere, but Broggi failed to do so and failed to produce the email, either in discovery or in response to the court order.  (*Id*., Ex. 4 at 18:5-19:3, 9:23-20:3, 45:24-46:20.)  In other words, neither the prosecutor, nor Broggi complied with their obligations to disclose evidence critical to plaintiff's defense.  Further, the trial court concluded that failure to disclose severely and significantly impacted plaintiff's right to a speedy trial and his ability to meaningfully defend himself at trial.

It is further apparent that evidence associated with the credibility of both Newell and Cuadra was crucial in this case.  (*See, e.g.*, *id*. at 15:15-16:18, 88:3-90:10 (Kline acknowledged Newell was the only individual to have identified a photograph of plaintiff as the possible shooter and the importance of his description of the shooter as an eyewitness; she described the evidence from Cuadra as "quite compelling", including her identification of plaintiff, the statements she made regarding his behavior that night, and her knowledge "of him having a firearm").)  Plaintiff also identifies other material, exculpatory evidence withheld by defendants, none of which

defendants here address, and continues to maintain prejudice through the delay in his trial and the extension of his unlawful pre-trial detention.

As argued by plaintiff, defendants do not show the absence of a material dispute about the exculpatory nature of all of the evidence at issue, defendants' fault in the failure to disclose evidence, or the causal connection between the failure to disclose and delays in the trial and the impact on the trial itself.  Defendants therefore fail to meet their burden of demonstrating their entitlement to summary judgment as a matter of law.

3.    Judicial deception:

Plaintiff alleges Olmstead and Broggi included false and misleading statements of material facts and omitted material facts in the affidavits for search and arrest warrants and in the certificate of probable cause.  He contends these statements and omissions were made knowingly and with reckless disregard for the truth and his constitutional rights.  He avers the violation of his Fourth and Fourteenth Amendment rights through the unreasonable search and seizure of his cell phone records and home, and his arrest and pre-trial detention without probable cause.

Plaintiff's "judicial deception" claim requires a showing the defendants "deliberately or recklessly made false statements or omissions that were material to the finding of probable cause." *Ewing v. City of Stockton*, 588 F.3d 1218, 1223 (9th Cir. 2009).  Probable cause "is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules."  *Gates*, 462 U.S. at 232.  With an affidavit in support of a warrant, the test for probable cause asks whether, given the totality of the circumstances, there is a fair probability evidence of a crime will be found.  *Id*. at 238.  Materiality, which is a question for the court, requires a demonstration the warrant would not have issued with false information redacted or omitted information restored.  *Smith v. Almada*, 640 F.3d 931, 937 (9th Cir. 2011).

REPORT AND RECOMMENDATION
PAGE - 19

For a judicial deception claim to survive summary judgment on the ground of qualified immunity, a plaintiff "must 1) make a 'substantial showing' of deliberate falsehood or reckless disregard for the truth and 2) establish that, but for the dishonesty, the challenged action would not have occurred." *Liston v. Cnty. of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997) (citing *Hervey v. Estes*, 65 F.3d 784, 788-89 (9th Cir. 1995)). "Materiality is for the court, state of mind is for the jury." *Butler v. Elle*, 281 F.3d 1014, 1024 (9th Cir. 2002) (citing *Hervey*, 65 F.3d at 789).

The Court must consider "'whether the affidavit, once corrected and supplemented, establishes probable cause.'" *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1084 (9th Cir. 2011) (citations omitted). "If probable cause remains after amendment, then no constitutional error has occurred." *Id.* If, however, the Court finds the alleged misstatements and omissions material, the defense of qualified immunity is lost. *Chism v. Washington*, 661 F.3d 380, 393 (9th Cir. 2011) ("'[I]f an officer submitted an affidavit that contained statements he knew to be false or would have known to be false had he not recklessly disregarded the truth . . . , he cannot be said to have acted in an objectively reasonable manner, and the shield of qualified immunity is lost.'") (quoting *Hervey*, 65 F.3d at 788-89). "Whether the alleged judicial deception was brought about by material false statements or material omissions is of no consequence." *Liston*, 120 F.3d at 973 (citing *United States v. Stanert*, 762 F.2d 775, *as amended*, 769 F.2d 1410 (1985)).

Defendants do not dispute plaintiff's allegation the search warrant affidavits and probable cause certificate contained false or misleading statements and omissions. Nor do they address the issue of whether a jury could find such misstatements or omissions were reckless or deliberate. Defendants, instead, assert their entitlement to qualified immunity because any misstatements or

REPORT AND RECOMMENDATION
PAGE - 20

omissions in the warrant affidavits were not material to probable cause.[3]  They assert this same

conclusion necessarily applies to the certificate of probable cause, which contained the same key

facts presented in the warrant affidavits.

Plaintiff identifies misstatements in the affidavits and certificate relating to the suspect's

appearance and plaintiff's identification.  First, the affidavits for search and arrest warrants stated

Detectives Broggi and Olmstead obtained footage from the motel surveillance system "of a

possible suspect that matched the description provided by Newell."  (Dkt. 42, Exs. 5 & 6 at 3.)

Second, the affidavits stated:  "Still photographs of the video depicting the possible suspect were

shown to Meyer and Newell separately.  Both agreed that the still photographs appeared to be the

same person who shot Love."  (*Id.*)  Third, the certificate stated in relation to the still photographs:

"Newell identified a male with a tan backpack, grey sweat suit and a baseball hat as the man who

shot Love.  He was 90% certain this was the suspect."  (*Id.*, Ex. 2.)

The surveillance video shows plaintiff wearing blue jeans, a grey sweatshirt with white

drawstrings and a white zipper, a brown backpack, and a black baseball hat with a white logo, and

with short, close-cut hair.  (Dkt. 39, Ex. 40.)  Identification for plaintiff obtained by the police

before Olmstead signed the first search warrant affidavit depicts plaintiff as six feet tall or six foot

one, weighing 200 or 210 pounds, and as thirty-nine years old on the date of the shooting.  (*Id.*,

Ex. 12 (May 2014 police photograph of plaintiff attached to September 15, 2016 email from Broggi

to Kline stating:  "This is going to be our shooter.") and Ex. 13 (plaintiff's Washington State

driver's license issued January 7, 2015).)

Newell described the shooter as around five-eight to six foot, 130-150 pounds, with "black

---

[3] Contrary to plaintiff's perception (*see* Dkt. 51), defendants continue to assert qualified immunity.

REPORT AND RECOMMENDATION
PAGE - 21

pants on, black shirt, a black over-shirt, a brown backpack, a black hat", a very dark complexion, and appearing to be in his early to mid-twenties.  (*Id.*, Ex. 6 at 2-3.)  Meyer described the shooter as about five-seven to five-nine and 140-160 pounds, wearing a "long sleeve button up shirt", and with "shaggy, [d]readed hair down to about his ears" (*id.*, Ex. 4 at 6, 14), and as wearing dark clothing, with dreadlocks, and "shorter and slender in build" (*id.*, Ex. 5).  Falgout described the shooter as "wearin' all black and a black hoodie." (*Id.*, Ex. 2.)  A police report indicates a witness named Jessica Hale described the shooter as "a black male, late twenties, wearing a gray hoodie (pulled over his head), black pants, [and] black backpack[.]" (Dkt. 42, Ex. 1 at 6.)[4]  As such, except for his race and Newell's report of a brown backpack and black hat, the witness descriptions of the suspect did not match plaintiff's appearance.

The information provided as to identification was also inaccurate and incomplete.  Meyer was not shown photographs of plaintiff from the surveillance video.   Newell was shown photographs, but was unable to make a positive identification.  (*See, e.g.*, Dkt. 39, Ex. 8 ("I just talked to [Newell]. Of the pictures I sent he is 95% sure it's the one with the backpack. If we get a better picture of him he can be sure. The backpack stood out to him cause it looked like a Ninja Turtle and didn't match what he was wearing.") and Ex. 27 at 47-48, 68-69 (Broggi testified the photographs sent to Newell did not result in a clear identification, leading to the decision to conduct a photo montage).)  Nor did Newell "identi[fy] a male with a tan backpack, grey sweat suit and a baseball hat as the man who shot Love."  (Dkt. 42, Ex. 2; *see* Dkt. 39, Ex. 31 at 9-12 and Dkt. 50, Ex. 3 (Judge Erlick's ruling the September 7, 2016 email was contradictory to the probable cause certificate as to Newell's description of the suspect's clothing and was "at best . . . ambiguous, and

---

[4] As noted above, Hale later testified at trial that this was not correct and provided a different description of the shooter.  *See supra* n. 1.

REPORT AND RECOMMENDATION
PAGE - 22

at worst . . . misleading and inaccurate").)

As described by plaintiff, corrected affidavits would have stated:

> Detectives Broggi and Mellis scoured the surveillance data from the Motel 6 and were able to obtain footage of a possible suspect from earlier in the week[.] ~~that~~ *The person was wearing blue jeans and a light grey sweatshirt. The person had on a backpack like one witness, William Newell, said the shooter wore. But the person in the video did not otherwise* match~~ed~~ the description provided by Newell *or other witnesses, all of whom described the shooter as wearing all black or all dark clothing, and one of whom described the shooter as having dreadlocks*. Still photographs of the video depicting the possible suspect were shown to ~~Meyer and~~ Newell. ~~Both agreed that the still photographs appeared to the same person who shot Love.~~ *Newell was unable to make a positive identification although he was shown multiple photographs of the same person and told the person was a suspect. . . .*

(Dkt. 51 at 13 (omitted information in italics).)  Similarly, a corrected probable cause certificate would have stated:

> Detective Mellis reviewed the security footage from Motel 6 over a 4-day period from various cameras. He identified several males fitting the general description of the shooter provided by the witnesses. Still photos of these males were sent to Newell *in two groups. Newell said none of the people in the first group was the shooter. Newell was then sent several security camera stills, all showing Rodney Wheeler. In the stills he was wearing blue jeans and a light grey sweatshirt rather than the dark clothing Newell and all the other scene witnesses described, and he did not have the dreadlocks Meyer described. He did have a backpack, as Newell said the shooter wore*. ~~Newell identified a male with a tan backpack, grey sweat suit and a baseball hat as the man who shot Love. He was 90% certain this was the suspect.~~ *Newell was unable to make a positive identification from these stills although he was told the person was a suspect*. That male is depicted on Motel 6 video on ~~several~~ *two other* dates, including the date of the murder. On all of these dates, he was wearing a tan backpack.

(*Id.* at 19 (omitted information in italics).)

The affidavits also failed to include any information about the photographic arrays.  (*See*

REPORT AND RECOMMENDATION
PAGE - 23

Dkt. 42, Exs. 5 & 6.)  They therefore failed to reveal that, when shown six photos including plaintiff, Newell stated the person who shot Love was not included, while Meyer identified two other individuals (neither of whom was plaintiff) as most closely resembling the person who shot Love.  (Dkt. 39, Ex. 14.)  The probable cause certificate mentioned the arrays, but stated only that neither Newell, nor Meyer "were able to identify Wheeler from the line up."  (Dkt. 42, Ex. 2.)

Omissions extended beyond appearance and identification.  For example, both the affidavits and certificate depicted plaintiff as engaging in suspicious behavior by repeatedly calling Cuadra shortly after the shooting, checking on her welfare, and encouraging her to leave the motel. (Dkt. 42, Ex. 2 at 5 and Exs. 5 & 6 at 3.)  However, they did not mention that Cuadra's phone and plaintiff's phone records did not reveal any such calls.  (*See, e.g.*, Dkt. 50, Ex. 6 at 159:1-160:10.) The affidavits omitted descriptions of plaintiff's cars given by Cuadra and Kidane and conflicting with eyewitness descriptions of the car driven by the shooter.  (*See* Dkt. 39, Ex. 2 at 3, Ex. 3, Ex. 6 at 6-7, and Ex. 18 at 3-7 (witness descriptions of shooter driving small black or dark sports car or sedan); Ex. 50, Ex. 9 (Kidane reported plaintiff typically drove a Silver SUV and had a silver/gold sedan and light purple SUV) and Ex. 10 (Kidane reported she knew plaintiff to drive a tan sedan).)  The certificate did not mention that plaintiff's phone records showed he had been out of state for two days and appeared on surveillance footage on only two other occasions during a time period in which Newell reported he had seen the shooter coming and going from the motel some eighteen to twenty-four times.  (*See* Dkt. 39, Ex. 6 (Newell described his sightings as occurring during his stays at the motel between August 23-26 and 29-31, 2016); *id.*, Ex. 3 at 104:19-105:3 (Detective Mellis testified that, between August 23rd and the 31st, plaintiff appeared in surveillance footage on the three occasions total (August 25th, 29th, and 31st)), Ex. 20 at 5-8, 21-24 (plaintiff's phone records show he was out of state beginning August 18th and returned in

the evening of August 25th).)

Plaintiff identifies other omissions, such as the fact a search of the premises found no rocks thrown at Newell's window (*see* Dkt. 50, Ex. 6 at 44:5-23), and that a call coming to plaintiff's phone at the time of the shooting connected to a different tower, farther north of the hotel (*see* Dkt. 39, Ex. 28 at 14 and Ex. 39 at 95:7-96:1).  Additional omissions relating to Cuadra and Kidane include the fact the detectives did not book either individual despite outstanding warrants, gave Cuadra $200 the week after her interview, and instructed Kent Police to hold off on filing charges against Kidane for possession of heroin.  (*See* Dkt. 39, Ex. 19 and Ex. 38 at 179-83.)

Defendants argue any misstatements and omissions were not material because the following information sufficed to establish probable cause:  Newell described the shooter as a black male wearing a brown leather backpack and black hat, with whom he and Love argued as the man crossed the parking lot and climbed over the fence, only minutes before the shooting; Newell reported he had seen the same man enter the property over the fence in the two weeks before the shooting and believed the man was dealing drugs at the motel; the police saw a possible suspect in surveillance footage and determined he had frequent contact with a room occupied by Cuadra and Kidane; Cuadra and Kidane identified plaintiff from the footage and reported he came to the hotel to sell heroin and usually parked behind and climbed over a fence to enter the property; Cuadra reported plaintiff carried an expensive brown leather backpack and provided three phone numbers for plaintiff; a booking photograph of plaintiff appeared to be the same person in the surveillance video; plaintiff had prior convictions for firearm-related offenses; and phone records established plaintiff's presence at the motel at the time of the shooting.

Defendants deny the significance of omitted witness descriptions of the suspect and assert a fair probability the shooter was the man with the distinctive brown leather backpack seen exiting

the motel, crossing the parking lot, and climbing the fence as Newell described.  They deny omission of the photographic array was material, stating probable cause does not require positive eyewitness identification, that neither Newell, nor Meyer interacted with the shooter at close range or in good lighting, and that plaintiff's baseball cap partially obstructed his face.  *See United States v. Colkley*, 899 F.2d 297, 302 (4th Cir. 1990) (finding not material the omission of the fact none of six eyewitnesses identified a criminal defendant in a photo montage or that three of the six identified other individuals as looking "'similar'" to the perpetrator of a robbery).  They also minimize the absence of evidence plaintiff called Cuadra after the shooting, contending detectives "had no way of knowing what Cuadra's phone number was on the day of the shooting[]" and noting they obtained records from only one of plaintiff's phones.  (Dkt. 53 at 10.)  Defendants observe that "'[t]echnical requirements of elaborate specificity'" are not required in affidavits.  *Gates*, 462 U.S. at 235 (quoting *United States v. Ventresca*, 380 U.S. 102, 108 (1965)).

The undersigned, however, agrees with plaintiff that any inferences of guilt drawn from plaintiff's presence and movements at the scene shortly before the shooting, brown backpack, involvement in selling drugs, and criminal record are overwhelmed by misstated and omitted facts.  Outside of his race and the brown backpack and black hat described by Newell, plaintiff's appearance differed from eyewitness descriptions of the shooter's clothing, height, weight, age, hair, and/or head covering.  Newell, who directly interacted with the shooter and had seen him on numerous other occasions, did not identify plaintiff in images taken just prior to the shooting.  Meyer, the other closest eyewitness, was never shown the images.  Newell stated the shooter did not appear in a photo montage and Meyer identified two other individuals as most closely resembling the shooter.  Cars associated with plaintiff did not fit eyewitness descriptions of the car driven by the shooter.  Plaintiff appeared on surveillance footage on only two occasions and was

REPORT AND RECOMMENDATION
PAGE - 26

out of state for part of the time period Newell reported he frequently saw the shooter at the motel. Nothing in plaintiff's criminal record or his reported status as a drug dealer could be said to involve the same or a similar crime to the one at issue.  No evidence was found of plaintiff's alleged suspicious-sounding calls to Cuadra shortly after the shooting, despite the fact the police had access to records for one of plaintiff's phones and both consent to search and access to Cuadra's phone.  (*See* Dkt. 39, Ex. 11 and Ex. 35 at 150:13-22.)[5]  Finally, cell phone tower data could be construed as supporting the conclusion plaintiff had left the premises at the time of the shooting.

The government need not include all information in an affidavit in order to support the existence of probable cause.  However, in this case, the affidavits failed to provide accurate information or sufficient detail as to witness reports and the identification evidence, and omitted a significant number of other facts pertinent to the issue of probable cause.  Nor is this an instance in which other compelling evidence outweighed misstated and omitted facts.  *Cf. Colkey*, 899 F.2d at 302 (finding any exculpatory value of omitted photo montage insufficient to defeat probable cause when weighed against the fact the defendant purchased a car with "bait bills" taken during the robbery and an informant's tip the defendant had admitted committing a remarkably similar robbery).

The Court, in sum, finds plaintiff's judicial deception claim to withstand the motion for summary judgment.  Defendants do not demonstrate plaintiff's failure to make a substantial showing of a deliberate falsehood or reckless disregard for the truth, or show that, once corrected and supplemented, the affidavits and certificate would suffice to establish probable cause.  Further,

---

[5] Olmstead could not recall who looked at Cuadra's phone and could not say whether there was any record of phone calls between plaintiff and Cuadra from plaintiff's phone. (Dkt. 39, Ex. 36 at 186:4-16 and Ex. 37 at 88:2-91:24.)  Broggi testified either she or Olmstead looked at the numbers on Cuadra's phone and did not recall seeing any numbers from plaintiff, and conceded they could have, but did not do a "phone dump" of Cuadra's phone.  (*Id.*, Ex. 38 at 187:8-188:23.)

REPORT AND RECOMMENDATION
PAGE - 27

1   because the Court finds material misstatements and omissions, defendants are not entitled to

2   qualified immunity.

3           4.   <u>Municipal liability</u>:

4           Defendants argue that, because there were no constitutional violations, plaintiff's *Monell*

5   claim fails as a matter of law.  The undersigned finds defendants do not establish their entitlement

6   to summary judgment in relation to plaintiff's claims for the reasons discussed above.  The Court

7   should, as such, deny defendants' related, conclusory assertion as to municipal liability.

8   D.   <u>Plaintiff's Motion for Partial Summary Judgment</u>

9           Defendants Broggi and Olmstead raise a counterclaim against plaintiff for malicious

10  prosecution against a law enforcement officer in violation of RCW 4.24.350.  (Dkt. 28 at 17-22

11  (alleging plaintiff instituted the action against them "with knowledge that the allegations therein

12  are false, unfounded, malicious and without probable cause for the filing of this action, and/or this

13  action was filed as part of a conspiracy to misuse the judicial process by filing an action known to

14  be false and unwarranted."))   Plaintiff seeks partial summary judgment dismissing the

15  counterclaim.  (Dkt. 38.)

16          A party may bring a malicious prosecution counterclaim on the ground that the original

17  tort action "was instituted with knowledge that the same was false, and unfounded, malicious and

18  without probable cause in the filing of such action, or that the same was filed as a part of a

19  conspiracy to misuse judicial process by filing an action known to be false and unfounded."  RCW

20  4.24.350(1).  To succeed with their malicious prosecution counterclaim, Detectives Broggi and

21  Olmstead must prove: (1) plaintiff instituted or maintained a malicious prosecution; (2) plaintiff

22  lacked probable cause to do so; (3) plaintiff acted with malice; and (4) the officers suffered injury

23  or damage as a result.  *Watson v. City of Vancouver*, C13-5936-RBL, 2015 U.S. Dist. LEXIS

31400, at *36-37 (W.D. Wash. Mar. 12, 2015).  *See also Chen v. D'Amico*, C16-1877-JLR, 2019 U.S. Dist. LEXIS 88063, at *75-76 (W.D. Wash. May 24, 2019) (officer must prove remaining elements of a malicious prosecution claim "except for arrest, seizure, damages, or termination or abandonment of the proceedings in the officer's favor.") (citations omitted).

As stated above, probable cause is a complete defense to a claim of malicious prosecution. *Hanson*, 121 Wn.2d at 558.  In asserting a claim, "a civil plaintiff need not have the degree of certainty as to the existence of the facts on which the proceedings is based that is required of a prosecutor in a criminal proceeding." *Brin v. Stutzman*, 89 Wn. App. 809, 822-23, 951 P.2d 291 (1998).  Rather, "the civil plaintiff must have a reasonable belief that the relevant facts can be established through the trial process." *Id*. at 823.  Stated another way, "in the civil context, probable cause means '[a] reasonable belief in the existence of facts on which a claim is based and in the legal validity of the claim itself.'" *Nguyen v. Cty. of Clark*, C10-5267-BHS, 2011 U.S. Dist. LEXIS 7350, at *9-10 (W.D. Wash. Jan. 19, 2011) (quoted source omitted).  Malice may be shown by establishing "the prosecution complained of was undertaken from improper or wrongful motives or in reckless disregard of the rights of the plaintiff." *Id.* at *11-12.

Plaintiff asserts the Court already largely upheld the legal validity of his claims in denying the motion to dismiss and points to the undisputed law underlying his § 1983 claims.  He identifies and attaches evidence supporting each of the factual allegations set forth in the amended complaint. (Dkt. 39.)  That evidence includes, *inter alia*, the above-described misstatements and omissions in the search warrant affidavits and probable cause certificate, Broggi's email describing plaintiff as "our shooter" even though there was "no pc yet" (*id*., Ex. 10), and her agreement the photos she sent Newell were of poor quality, did not result in a clear identification, and that plaintiff was never associated with a small black car like the one described by eyewitnesses (*id*., Ex. 27 at 47-48, 66-

REPORT AND RECOMMENDATION
PAGE - 29

69).  It also includes the circumstances surrounding the identification evidence from Newell – from the misstatement in the certificate, to Broggi's varying reports and supplemental reports, the disclosure, only after the trial began, of Broggi's email containing Newell's actual response to the surveillance photos, and Judge Erlick's finding of severe and significant prejudice to plaintiff and belief the probable cause certificate was misleading and inaccurate.  (*See id.*, Exs. 3, 8, 21, 25, 31; Dkt. 50, Ex. 3.)

In responding to plaintiff's motion, defendants contend that, viewing the facts and justifiable inferences in the light most favorable to them, all of plaintiff's allegations, including malicious prosecution, violation of due process, and judicial deception, are false and unfounded. They point to the same facts and the same arguments made in support of their motion for summary judgment.  (Dkt. 44.)  Defendants also state, with no further discussion, that the falsity of plaintiff's allegations at least involve a genuine issue of material fact that preclude summary judgment.

Plaintiff raises a malicious prosecution claim against King County, not against Broggi or Olmstead.  (*See* Dkt. 8, ¶5.4.)  As argued by plaintiff, it does not appear Broggi and Olmstead may raise a counterclaim of malicious prosecution in relation to a claim not made against them.  *See generally Ray Charles Found. v. Robinson*, 795 F.3d 1109, 1118-19 (9th Cir. 2015) (a claimant "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.") (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).

The Court, in any event and for the reasons discussed above, finds plaintiff had probable cause to allege malicious prosecution, due process violations, and judicial deception.  That is, plaintiff had a reasonable belief in the facts on which his claims were based and defendants do not show plaintiff filed a claim "known to be false and unfounded."  RCW 4.24.350(1).  Because plaintiff's claims present legitimate issues requiring resolution by the Court, defendants'

REPORT AND RECOMMENDATION
PAGE - 30

counterclaim is properly dismissed on summary judgment.  *See Ostrander v. Madsen*, No. 00-35506, 2003 U.S. App. LEXIS 1665, at *7-8 (9th Cir. Jan. 28, 2003) (finding no error in dismissal of malicious prosecution counterclaim on summary judgment where plaintiff presented a legitimate issue of whether officers used excessive force and therefore had probable cause to bring that claim) (citing *Hanson v. Estell*, 100 Wn. App. 281, 286-87, 997 P.2d 426 (2000) (while dismissed on summary judgment, plaintiffs had probable cause to bring the issues to court where the trial court "found their suit 'neither frivolous nor brought maliciously, as there were legitimate issues' requiring resolution by the court.")) *See also Chen*, 2019 U.S. Dist. LEXIS 88063, at *79-80 (finding probable cause to allege judicial deception, deliberate fabrication, selective enforcement, and malicious prosecution claims where, although defendants prevailed on summary judgment, plaintiff had a reasonable belief in the facts on which the claims were based); *Watson*, 2015 U.S. Dist. LEXIS 31400, at *37 ("There are questions of fact left to resolve at trial on Watson's excessive force claim. These questions of fact indicate that there was probable cause for Watson to bring and maintain his action.")

## CONCLUSION

The Court, in sum, concludes defendants' motion for summary judgment (Dkt. 41) should be DENIED, plaintiff's motion for partial summary judgment on defendants' counterclaim (Dkt. 38) should be GRANTED, and defendants' counterclaim should be DISMISSED.

## OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and Recommendation is signed.  Failure to file objections within the specified time may affect your right to appeal.  Objections should be noted for consideration on the District Judge's motions

REPORT AND RECOMMENDATION
PAGE - 31

1    calendar for the third Friday after they are filed.  Responses to objections may be filed within

2    **fourteen (14)** days after service of objections.  If no timely objections are filed, the matter will be

3    ready for consideration by the District Judge on **April 2, 2021**.

4         DATED this 15th day of March, 2021.

5

6    _____

7    Mary Alice Theiler
     United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

REPORT AND RECOMMENDATION
PAGE - 32